[Civ. No. 15290.   Second Dist., Div. One.   Oct. 17, 1946.]

ROADSIDE REST, INC. (a Corporation), Respondent, v. THE LANKERSHIM ESTATE (a Corporation) et al., Appellants.

Walker, Adams & Duque, Irving M. Walker, Mark Mullin, Aaron Sapiro and Samuel De Groot for Appellants.

Lee Combs for Respondent.

DORAN, J.—The present action seeks declaratory relief concerning certain provisions of a sublease under which Roadside Rest, Inc. operated a restaurant. The controversy involved an alleged modification of such sublease, changing the computation of rent from a monthly to a yearly basis as determined by gross income. The primary defendant is the Lankershim Estate, owner and lessor of the property, all rights of the other defendants being derivative therefrom. On

April 10, 1941, the Lankershim Estate leased to Carlyle Nibley and Hal C. Mors, a piece of property extending about 1,200 feet on Roosevelt Highway, Santa Monica, California, for a 25-year period, the lease containing a covenant against subletting "without first obtaining written consent of Lessor," and providing that "any sublease made otherwise would be voidable at the option of Lessor." The complaint states that on June 16, 1941, Nibley and Mors, the original lessees, subleased the north 100 feet of this property for 15 years to John E. Burns, John Drew and Henry Anderson, the subleasing being approved by the Lankershim Estate. About June 17, 1941, this sublease was assigned to Roadside Rest, Inc. in which corporation, Burns, Drew and Anderson were interested. Some three months later Drew sold his interest therein; somewhat later Anderson sold out, and Roadside Rest was thereafter operated by Mr. and Mrs. Burns. On December 30, 1941, the original lease from the Lankershim Estate to Nibley and Mors was terminated by court action, and on December 30, 1941, a new lease of the entire property was made by the Lankershim Estate to John Drew, subject, however, to the "sublease dated June 16, 1941" covering the Roadside Rest property. Under the terms of this new lease, the lessee Drew was to collect rent from the sublessee, and to remit 25 per cent thereof to the Lankershim Estate. This new lease was assigned by Drew to The Variety Club. The complaint further alleges that about July 18, 1944, John Drew and the Lankershim Estate demanded certain additional rent from Roadside Rest, Inc. in the amount of $3,372.21, basing such claim upon the original clause 2 of the sublease, which provision respondent claims was modified by the substitution of a new clause 2, evidenced by an additional sheet attached to the sublease.

The original sublease covering the Roadside Rest property, was prepared in the office of Walker, Adams & Duque, attorneys for the Lankershim Estate, and following the signatures of the contracting parties, is found the written approval of the estate, signed by Irving Walker, the estate's director and vice president. Paragraph 2 of this sublease, as originally drawn, provided that the sublessees should pay to the sublessors the sum of $3,000 annually on the first day of July; further, that monthly thereafter, "Sublessees shall compute their gross receipts for the preceding calendar month. In the event that nine per cent (9%) of said gross receipts exceeds

the sum of Two Hundred Fifty Dollars ($250.00), then on or before the 10th day of each such month Sublessees shall pay to Sublessors the difference between Two Hundred Fifty Dollars ($250.00) and said nine per cent (9%) of such gross receipts." Page 2 of Plaintiff's Exhibit 1, containing this provision, appears to have been crossed out by two diagonal lines, and at the right hand margin thereof is written with pen, "6-17-14," below which are the initials, "C N," (for Carlyle Nibley), and "H G M," (for Hal G. Mors), "J D," (for John Drew), "J.E.B." (for John E. Burns), and "H A," for Henry Anderson. No initials appear thereon other than those named above, and there is no documentary evidence, by initialing or otherwise, indicating that the Lankershim Estate acquiesced in this alteration.

Attached by staples to the sublease and just preceding the original page 2 crossed out as hereinbefore mentioned, is an additional or substituted page 2 which appears to have been written on a typewriter different from that used in preparing the original page 2 and the rest of the sublease. This substituted page 2 is not initialed by anyone, nor does any date appear thereon. A material change in rental terms is provided for in the substituted page 2, which stipulates that the minimum annual rent shall be $3,000, and that "(b) The overage of 9% of the gross receipts of the Sublessees' business shall be payable at the expiration of each year unless as hereinafter provided"; thereafter providing that the sublessees shall monthly "compute their gross receipts for the preceding calendar month; In the event that the 9% of the gross receipts at any time exceeds the minimum rental of $3000.00, then on or before the 10th day of the following month, the Sublessees shall pay to the said Sublessors 9% of such gross receipts until the end of the year." The practical effect of this change, according to the appellant Drew's opening brief, "is to transform a monthly excess, as provided in the original clause 2, to an excess calculated on the annual basis."

The actual controversy giving rise to the action for declaratory relief is, in the language of respondent's brief, "over the question as to whether clause 2 of the sublease as originally proposed or the substituted clause 2 is in effect and governs the measure of rent under the sub-lease." The trial court found that the substituted clause 2 was the "true sublease," which "was and is the agreement between the parties thereto as executed on or about the 16th day of June, 1941, and as

has remained in force since its execution.'' The original clause 2 is denominated by the trial court the ''mistaken sublease.'' The court further found ''That the defendant The Lankershim Estate has not given its written consent to said true sublease, but said defendant, at or about the time of the execution of said true sublease, had knowledge that a sublease had been executed between the parties to the true sublease and gave its written consent to a sublease which it then believed to be the sublease between said parties and which sublease so consented to by said defendant was in words and terms identical with the true sublease excepting as to Clause 2 thereof involving the consideration for the lease.'' Paragraph XIII of the Findings of Fact state: ''That since August, 1941, the defendant The Lankershim Estate, . . . has known that the Roadside Rest, Inc. claimed possession of the Roadside property under a lease different as to paragraph 2 thereof from the mistaken sublease; that . . . The Lankershim Estate either has known of the existence of the true sublease . . . or has been put on inquiry to learn the facts with respect to said tenancy and to learn of said true sublease and the terms thereof.'' There are also findings to the effect that defendants never ''gave Roadside Rest, Inc. notice of an election to declare said true sublease void for want of the written consent of The Lankershim Estate or for any other cause''; that the defendants ''accepted and received the rentals under the terms and conditions of the . . . true sublease . . . from August, 1941 to July 1, 1944''; and that the defendant John Drew at all times knew of ''the existence and of the terms of said true sublease.''

It is the appellants' contention that the findings of the trial court ''are contrary to the pleadings and the evidence and do not support the judgment'' holding that the substituted page 2 of the document in question constituted the ''true sublease,'' and that the defendants knew or should have known of the substitution and acquiesced therein. It is particularly urged that the finding to the effect that the Lankershim Estate is bound by a constructive consent to the so-called ''true sublease'' or substituted page 2, is not supported by the evidence. Briefly, therefore, this appeal is concerned with two basic questions: (1) What was the real sublease entered into on or about June 16, 1946?; and (2), Did the Lankershim Estate, owner and lessor, by reason of its knowledge or otherwise, give constructive approval of the modified sublease? The correct

answers to these questions obviously depend upon the state of the record.

At the outset it is well to note the fundamental proposition, reiterated in section 1981 of the Code of Civil Procedure, that "The party holding the affirmative of the issue must produce the evidence to prove it; therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side." In the present case, obviously, the burden rested on the plaintiff, Roadside Rest, to establish the allegations of its complaint. Moreover, in paragraph IX of that complaint, it is directly alleged that on or about June 17, 1941, "with the knowledge, consent, acquiescence and approval of the Lankershim Estate and its duly authorized agents and representatives, the section known as clause 2 . . . was stricken out and in lieu thereof was substituted" the modified clause 2 changing the overage rental terms from a monthly to a yearly basis, as hereinbefore mentioned. This allegation concerning an alleged alteration of the original document makes applicable section 1982 of the Code of Civil Procedure which provides that "The party producing a writing as genuine which has been altered, or appears to have been altered, after its execution, in a part material to the question in dispute, must account for the appearance or alteration." That the provision known as clause 2, changing the rental basis, is material, there can be no doubt. The burden, therefore, of establishing that the substituted clause 2 represented the true agreement, and that the Lankershim Estate in some manner approved this important alteration, clearly rested upon Roadside Rest, Inc.

It is to be observed that the record furnishes no satisfactory answers to the important questions as to who actually prepared the substituted page 2 and as to the exact time when this substitution was made. The respondent dismisses this inquiry with the observation that since it is evident that the change was made, the time and place of making such modification is immaterial. It is impossible to accede to this proposition; the time of alteration and the circumstances connected therewith, are of the utmost importance in determining the validity of the alleged modification and the owner's approval thereof. John Drew, one of the original sublessees testified: "When I signed that lease, there were no changes or marks"; that there was some conversation concerning a change, but that no document was ever presented embodying any change;

that Mr. Charlesworth, the broker, about a week or 10 days later, asked Drew to initial ''the page you want to have changed, I will take it up with Mr. Nibley and Mr. Mors (sublessors), and see if I can get the change you desire to have made''; that Drew never saw the alleged substituted page 2 until about a year before the trial. Drew further testified that the initialing and crossing out of the original page 2 was done in the belief that the change, if any, would be effected ''with the consent of the Lankershim Estate and our initials on it.'' Harold G. Mors, original sublessor, first testified that at the time the original page 2 was initialed, the substituted page 2 was stapled on to the sublease. However, on interrogation by the court, this witness said: ''Your Honor, I do not recall whether the main sublease was signed and the change was done afterwards, or whether the change was put on there before we all signed this. I do not recall that.'' Mors knew ''that the consent of the Lankershim Estate was necessary.'' When later recalled, the witness did not remember about certain lines in the original sublease being crossed out, and said: ''I paid no attention to this lease.'' Cross-examination brought out the fact that the witness did not remember where the document was signed, the time at which it was signed, or whether all of the parties signed it at the same time; or whether the substituted page 2 was stapled to the agreement when it was signed. The witness again stated: ''As I said, it is only a guess. I do not remember. I paid very little attention to the lease.'' Obviously, the testimony of Harold G. Mors is without value in solving the present controversy, and proves nothing. Another witness produced by respondent, Herman Miller, a brother-in-law of John Burns, one of the sublessees, testified that the original sublease was signed ''with the promise that the changes would be made, and the new sheet included, with the change, . . . And I was not present when they drew up the last stuff and initialed it, which came at a later date.''

One H. F. Metcalf testified to receiving a monthly salary from the Lankershim Estate ''as a general expert in real estate matters,'' although not being an officer or director of the estate. The broker Charlesworth, who negotiated the sublease in question, used Metcalf's office. Sometime after signing the sublease, according to this witness, Charlesworth told Metcalf ''they had made an error, he thought in negotiating their

lease; that is, it called for a monthly percentage, which is what all this talk is about, and they wanted a yearly percentage. . . . He came to me to see if I could assist him in getting the lease changed.'' Metcalf did nothing in that connection, let the matter drop, and did not submit it to the Lankershim Estate. ''I had no reason to change it,'' explained the witness. Metcalf further stated: ''I negotiated no changes in that lease, your Honor—none. I had no authority to change it myself.'' The testimony is also to the effect that Metcalf ''never saw it (the substituted page 2) until I saw it the other day.'' Mrs. Burns, secretary-treasurer of Roadside Rest, testified to sending monthly gross income reports to Drew until July, 1944, thereafter to the Lankershim Estate. Mrs. Burns was not present when the original lease was discussed. John Burns had nothing to do with the lease and did not remember anything. The broker, J. A. Charlesworth testified ''I do not recall it (initialing of page 2) sufficiently to testify.'' First testifying that the documents ''were altered in escrow, prior to disbursement of the funds,'' Charlesworth later informed the court that substituted page 2 ''was not on the lease when it was delivered,'' and ''To the best of my knowledge there were no additions made to the lease at the time the lease was closed in escrow. I was present at the time. No change was made in connection with the percentage. I do not know of any typewritten sheet such as this being attached to the lease at the time it was completed in escrow''; that the witness was not present when the initialing or marking of the sheets was done.

Finally, there is the testimony of Irving Walker, vice president and director of the Lankershim Estate, that at the time the estate's written approval was appended to the sublease and signed by Walker, no portion was crossed out, nor did any initials appear on the margin. ''I have a very definite recollection,'' said Mr. Walker, ''that the provision in the sublease at the time I gave my consent to it was . . . to the effect that the percentage of the rent should be calculated on a monthly basis,'' and that no person ever asked Walker, as an official of the Lankershim Estate, to amend the sublease. Mr. Walker's office prepared the sublease, and the witness testified: ''It has been my uniform requirement that the signatures to documents which were to be signed by the Lankershim Estate and other parties be signed by the other parties before I signed for the Lankershim Estate.'' Mr.

Walker further testified that Nibley and Mors, original lessees, were "very unsatisfactory tenants," that it was doubtful whether such lessees would be able to perform their obligations; therefore Walker, on behalf of the Lankershim Estate, was interested in a satisfactory sublease, and "was anxious to know that the terms of it (the sublease) had been agreed upon in accordance with my understanding of what those terms would be," since if the original lease failed, under provisions of the sublease, the sublessees would then become the direct tenants of the Lankershim Estate.

The trial court's conclusion that the substituted page 2 of the document constituted the "true sublease," and that the original page 2 was merely a "mistaken sublease," is not supported by the record. All that the evidence shows in respect to this matter, is that after the original sublease was executed, and after written approval in that form by the Lankershim Estate, there was some discussion to which the estate was not a party, in regard to making the rental terms more favorable to the sublessee, by changing the computation from a monthly to a yearly basis. But the fact remains that no modified sublease embodying any such proposed change was ever presented to or approved by the Lankershim Estate, and the trial court found that the estate "has not given its written consent to said true sublease" (The modified sublease). The most that is indicated by the evidence is that at some unknown time and place, some unidentified person prepared and attached to the document a new page, crossing out the original provisions as to rental terms. Any sublease negotiated was without value except as its terms were approved by the estate, and the only conclusion justified under the evidence, is that the original, and not the substituted rental provision represents the only agreement actually made, executed and approved. The law quite definitely provides how a lease or other contract may be changed, section 1698 of the Civil Code specifying that "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

The further question whether the Lankershim Estate, although not giving written consent, nevertheless in effect approved the alteration by reason of some knowledge "of the existence of the true sublease," in the language of the trial court's finding, or because the estate had "been put on inquiry

to learn the facts with respect to said tenancy and to learn of said true sublease and the terms thereof,'' must likewise be resolved in favor of the appellants. The record discloses no circumstances indicating either actual or constructive knowledge or approval of anything other than the original sublease approved in writing. To hold otherwise would seem to place upon the Lankershim Estate a burden to ascertain at its peril whether lessees and sublessees had, behind its back and without the stipulated approval, crossed out an important page of the original sublease and substituted therefor some provision deemed more advantageous. This cannot be the law. The evidence of such an alteration and its approval should not rest upon supposition, nor upon the fact that several years after execution of the original sublease, a new page containing a vital alteration in the rental terms, is found to have been attached to the document by some unknown person, at some unknown time and place.

Respondent's brief suggests that the Lankershim Estate knew of the alteration because of the fact that John Drew, originally sublessee and later a lessee of the estate, ''was for a period of years the agent of the Lankershim Estate for the collection of the rent.'' It is true that, as a matter of convenience Drew was authorized to collect rent from the sublease, and in the final leasing arrangement Drew was required to pay to the Lankershim Estate 25 per cent of the rent collected from Roadside Rest, Inc. The arrangement, however, was nothing more than this, and Drew was no more the representative of the owner than is any other lessee; the fact can in no manner affect the present controversy. The respondent, further, would impute knowledge and approval to the Lankershim Estate by reason of the acceptance of rent which respondent says was ''computed on the basis of the modified draft.'' But, as said in the brief of the estate, whatever rent came to it was merely accepted under the justifiable belief that the original sublease, which was the only agreement ever approved, represented the only existing sublease. Obviously, had the estate been advised that the rental terms had been modified, some appropriate action would have been taken. Ratification requires knowledge and the record discloses nothing of this nature. To say that the estate owed some kind of a duty to obtain this knowledge is to again indulge an unwarranted assumption amounting to a reversal of the burden of proof. Constructive consent or approval in respect to the alleged

modification is much too important a matter to rest upon anything other than clear evidence.

The respondent further suggests that "the great probabilities are" that the Lankershim Estate's copy of the sublease, not produced in court, "contains the identical alterations" contended for by respondent. Here again is an attempt to justify the judgment on the ground of probabilities. Moreover, as pointed out in the Lankershim reply brief, the photostatic copy of the sublease reveals that the sublease was "made and entered into in duplicate," and both of the executed and approved copies of the sublease were before the court as Exhibits 1 and 7. So far as probabilities are concerned, inferences unfavorable to respondent's contentions might likewise be suggested from the fact that two of the original five parties to the controversial sublease were not called as witnesses, namely Mr. Carlyle Nibley and Mr. Henry Anderson. However, as hereinbefore mentioned, a judgment should not rest upon probabilities, conjecture or vague inferences concerning what a given situation might or should have been.

For the reasons hereinbefore expressed, the judgment is reversed with directions to enter a judgment declaring that the original sublease without modifications, as approved by the Lankershim Estate in writing, is the only valid and subsisting sublease, and that such original sublease governs the rights of the parties thereto and those claiming under them.

York, P. J., and White, J., concurred.

A petition for a rehearing was denied November 4, 1946, and respondent's petition for a hearing by the Supreme Court was denied December 12, 1946. Shenk, J., Carter, J., and Schauer, J., voted for a hearing.